Filed 7/24/13  In re M.C. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re M. C., a Person Coming Under the Juvenile Court Law. | B243859 |
| | (Los Angeles County Super. Ct. No. CK87393) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent.  v.  JANELLE C.,  Defendant and Appellant. | |

THE COURT:*

      Appellant Janelle C. (mother) appeals from the juvenile court's order terminating her parental rights over her daughter, M. C. (born April 2011).  We dismiss the appeal.

_____

*ASHMANN-GERST, Acting P. J., CHAVEZ, J., FERNS, J.†

†Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## BACKGROUND

**Detention and section 300 petition**

On April 9, 2011, the Los Angeles County Department of Children and Family Services (Department) received an emergency response referral on behalf of newborn M. During delivery, mother disclosed that she was hearing voices and hallucinating. After M.'s birth, mother continued to display symptoms of mental illness, including manic behavior and paranoia.

The Department's social worker met with mother in the hospital on April 9, 2011. During that meeting, mother reported a history of mental health issues but would not disclose her diagnosis. She stated that she chose to discontinue taking medication but would not disclose the medication previously prescribed for her. Mother further stated she did not know the identity of M.'s father.

The following day, the social worker spoke with Dr. Rose, a psychiatrist on staff at the hospital where mother and M. were staying. Dr. Rose opined that mother's current mental health issues rendered her incapable of caring for M.

On April 13, 2011, the Department filed a petition pursuant to Welfare and Institutions Code section 300, subdivision (b)[1] on behalf of M. alleging that mother's mental and emotional problems rendered her incapable of providing the child with regular care and supervision. At the detention hearing held on that same date, mother appeared and identified M.'s father as Robert G. The juvenile court found a prima facie case for detaining M. from mother and ordered the child detained with a maternal cousin. The court accorded mother monitored visits for a minimum of three times a week, two hours per visit, and gave the Department discretion to liberalize the visits.

On May 20, 2011, the Department filed an ex parte application seeking to vacate the order detaining M. in the maternal cousin's home because the cousin could no longer care for the child. The Department reported that it was exploring other placement options, including placement with out-of-state relatives. The juvenile court granted the ex parte application and ordered M. placed in foster care.

---

[1]    All further statutory references are to the Welfare and Institutions Code.

On May 27, 2011, the Department filed a first amended petition adding an allegation that M.'s alleged father, Robert G. had failed to provide for the child.

**Jurisdiction/disposition**

In its May 2011 jurisdiction/disposition report, the Department reported on a May 2, 2011 interview with mother and a telephone conversation between mother and a dependency investigator on May 18, 2011. During the interview, mother said that she was unemployed but supported herself through social security disability income. When asked about the nature of her disability, mother said she had been diagnosed with "manic depression" in 1996. Mother objected to the removal of M. from her care and said she felt victimized by the Department. During the May 18, 2011 telephone call, mother alternated between whispering and speaking at a normal volume. Most of her comments were directed toward the Department's unfair treatment of her.

Included in the Department's jurisdiction/disposition report were summaries of email and telephonic communications between the dependency investigator and mother's siblings, Nicole, Gregory, and Jennifer. All three siblings stated that mother had longstanding mental health issues that improved when she took her prescribed medication and that deteriorated when she did not. Nicole reported that mother's symptoms of paranoia and delusions seemed to escalate as her pregnancy progressed. All three siblings expressed concerns about mother's ability to care for M.

The dependency investigator also spoke with maternal cousin Kalyn, with whom M. had initially been detained. Kalyn reported that mother appeared to be obsessed with dust, mold, and perceived impurities on M.'s skin and that mother was constantly picking at the baby's face during her monitored visits. After M. was placed in foster care, mother's monitored visits appeared to go well overall; however, mother continued to be overly concerned with cleaning the baby, repeatedly doing so with wet wipes throughout the visits.

At the May 27, 2011 jurisdiction/disposition hearing, mother pled no contest to the allegations in the first amended petition, and the juvenile court sustained the amended petition as to mother. The court ordered an Evidence Code section 730 evaluation of

mother, and ordered mother to cooperate with the evaluation, to complete parenting education and individual counseling to address mental health issues, and to take all prescribed medications. The court accorded mother monitored visits three times per week for a minimum of two hours per visit.

The juvenile court found Robert G. to be M.'s alleged father. Because the Department's efforts to contact Robert G. had been unsuccessful, the court dismissed the allegations of the petition pertaining to him.

The court assumed jurisdiction over M. pursuant to section 300, subdivision (b) and ordered that she remain suitably placed. The court authorized the Department to investigate placing M. with a maternal aunt who lived outside the state.

**Evidence Code section 730 evaluation**

An Evidence Code section 730 evaluation was submitted to the juvenile court on August 22, 2011. The evaluation, prepared by Dr. William Vicary and by Dr. Jonathan Manaoat, both of the USC Keck School of Medicine, reported on their examination and evaluation of mother. During the examination, mother disclosed a history of mental health issues dating back to her years in high school. Mother further disclosed that she had been hospitalized at least three times for inpatient psychiatric treatment.

Mother stated that her concern over her skin started in 2007 and that she had seen multiple dermatologists and infectious disease doctors for "skin rot." She claimed she could "hear vibrations" and "voices" which are "abusive" and say things to her such as "movie star quality." Mother also claimed she could "channel energy," see "red and green energy," "chromosomes float from DNA on skin," as well as "needle points," "mold" and "invisible hairs."

The evaluating psychiatrists concluded that mother's symptoms were consistent with a diagnosis of "Bipolar I Disorder, Severe, with Psychotic Features." They recommended continuous psychiatric intervention, including ongoing psychotherapy, and antipsychotic and antimanic medication. The evaluators further recommended that M. remain a dependent of the court, that mother be accorded monitored visits and

4

reunification services, and that she be reevaluated in one year to reassess her ability to benefit from reunification services.

**Review proceedings and termination of services**

In November 2011, the Department reported that M. was placed in a licensed foster home. An approved ICPC[2] home study had been received for maternal aunt Gayle D. in Pennsylvania, and the Department recommended that the juvenile court give the Department discretion to place M. with Gayle.

Mother had enrolled in a parenting program but had not signed a consent to release information regarding her participation in the program to the Department. Mother reported that she had attended only four or five parenting sessions. She had failed to comply with the juvenile court's orders to take prescribed psychotropic medication and to participate in individual counseling.

Mother had missed approximately 25 percent of her monitored visits with M. Three visits had been cancelled by the monitor because of concerns regarding mother's behavior during the visits. During the visits, the monitor observed mother picking at M.'s clothing and body, claiming the child was covered in dog hairs. Mother habitually wiped M.'s face until the child's face became red and irritated. She voiced concerns about debris becoming "embedded" in M.'s skin and attempted during several visits to use her finger to remove perceived debris from the child's eye. When redirected, mother became agitated. Mother also appeared to be unaware of M.'s needs and development. She repeatedly asked the monitor about the baby's feeding time, insisted on substituting formula for solid food, and attempted to have M. recite the alphabet or use crayons and paper, even though such activities were not age-appropriate.

At a hearing held on November 23, 2011, the juvenile court found that mother was not in compliance with her case plan, that the Department had provided reasonable efforts, and that there was no substantial probability that M. would be returned to mother within the next six months. The court terminated family reunification services, set a

---

[2]    Interstate Compact on the Placement of Children, Family Code section 7901 et seq.

section 366.26 hearing for March 21, 2012, and ordered the Department to initiate an adoption home study.

**Section 366.26 proceedings**

In March 2012, the Department reported that M. had been placed with out-of-state relatives, maternal aunt Gayle and her husband, since December 8, 2011. Gayle and her husband were also M.'s prospective adoptive parents. They had four children, ages fourteen, ten, seven, and four. The family had grown very attached to M. and wanted to adopt her. Mother remained in California but had regular telephonic contact with M. and her caregivers.

At the March 21, 2012 hearing, mother was appointed new counsel. The juvenile court identified adoption as the permanent plan and continued the section 366.26 hearing to July 5, 2012.

In May 2012 , the Department reported that M. had adjusted well in the home of her prospective adoptive family, was meeting all of her developmental milestones, and appeared to be happy. She had become attached to her caregivers, who remained willing to adopt her. The prospective adoptive parents sent photographs to mother and facilitated telephone contact between mother and child. A request for an adoption home study had been submitted to the State of Pennsylvania.

In July 2012, the Department reported that M. and her caregivers continued to bond with each other, and the caregivers consistently reported that they wanted to adopt the child. Mother had been informed that she could have monitored visits if she traveled to Pennsylvania.

**Section 388 petition**

Mother filed a section 388 petition on July 5, 2012, requesting an additional six months of reunification services. In her petition, mother alleged she was now living in a stable home, was seeing a new psychologist, Dr. Stephen Fleisher, and was compliant with Dr. Fleisher's recommendations. Mother further stated that no psychotropic medication had been prescribed for her.

6

Attached to mother's section 388 petition was a letter from Dr. Fleisher dated June 30, 2012, stating that he had seen mother for 33 sessions since November 2011. Mother had rented a room and was receiving job training from the State Department of Rehabilitation. She was not manifesting any of the mental illness symptoms previously described to the court, and her current diagnosis was Mood Disorder, Not Otherwise Specified, in full remission. Dr. Fleisher opined that mother was now ready for the reevaluation for reunification services that had been recommended in her Evidence Code section 730 evaluation. Dr. Fleisher further opined that mother should not be required to take psychotropic medication because she was extremely sensitive to medication and experienced severe side effects. He recommended that mother receive another court ordered evaluation and that the case be transferred to Pennsylvania if mother relocated there so that mother could have regular contact and visitation with M. Dr. Fleisher stated that the visits should be monitored at first, but only for the first month, as he believed mother posed no threat to M. He also recommended that the adopting relative consider an open adoption.

In its response to the section 388 petition, the Department reported that mother had met with the social worker on August 14, 2012. Mother provided a new home address and said she was seeing Dr. Fleisher on a weekly basis. She had not completed a parenting class because she did not feel the class was appropriate for her. Mother said she had not taken medication in seven years and that she did not need to do so. She received photos of M. and spoke with her by telephone two to three times per week. Mother had wanted to see M. during a family reunion in Utah in June, but the social worker had discouraged the visit. Mother said she would be willing to relocate to be closer to M. if she were granted more reunification services.

The social worker also spoke to the prospective adoptive mother, Gayle, who reported that M. was thriving in her home and had become a part of her family. Gayle explained that the Pennsylvania social worker had discouraged mother from attending the family reunion in Utah for the sole purpose of visiting with M., because no family member was willing to serve as the monitor for her visits, but mother had gone to Utah

anyway and had been denied a visit. Mother had also asked Gayle and her husband to assume legal guardianship over M. instead of adopting her.

On August 10, 2012, the social worker received a telephonic update from mother's psychologist, Dr. Fleisher. Dr. Fleisher stated that he had to correct a previous diagnosis he had made of mother's condition. His previous diagnosis -- that mother had experienced a full inter-episode recovery -- was incorrect. Mother's diagnosis was *without* full inter-episode recovery. Dr. Fleisher explained that when mother was under stress, she experienced "very odd thinking." Although he did not believe mother was a danger to anyone, including M., he did not know what would happen if mother were under stress. For this reason, he could no longer recommend unmonitored visits between mother and M., nor could he testify on mother's behalf.

### Section 388/366.26 hearing

A contested section 388/366.26 hearing was held on August 21, 2012. On that same date, the Department reported that an adoption home study had been approved for M.'s prospective adoptive parents.

At the hearing, mother testified that she had been seeing Dr. Fleisher on a weekly basis for more than a year. Although mother had been informed of Dr. Fleisher's statements regarding her odd behavior, she had not discussed the matter with him. Mother said that the last time she had seen M. was on December 13, 2011. Since that date, she had been having telephone contact with M. one to two times per week. M. did not know who mother was when they spoke, nor did she know that mother was her mother. Mother believed that she and M. shared "somewhat" of a bond, but acknowledged that it was difficult to have a bond with a child who was removed from her care as an infant. Mother also believed she had been treated unfairly, both by the Department and her own family, from whom she had been estranged for seven years. She said it would be in M.'s best interest to be reunified with her in the future.

The juvenile court denied mother's section 388 petition, finding there had been no change in mother's circumstances and that it was not in the best interests of the child for mother to receive additional reunification services. The court further found that

continued jurisdiction over the child was both necessary and appropriate, that M. was adoptable, that it would be detrimental to the child to return her to mother, and that no exception to terminating parental rights applied. The court then terminated mother's parental rights, as well as the parental rights of anyone else claiming to be M.'s parent.

**The instant appeal**

We appointed counsel to represent mother in this appeal. After examining the record, mother's counsel filed a brief pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835, indicating an inability to find any arguable issues. On April 25, 2013, we advised mother that she had 30 days in which to submit any contentions or arguments she wished us to consider.

Mother submitted a letter brief in which she requested new appellate counsel, and we denied that request. In her letter brief mother stated that the case to remove M. from her was based on false and biased statements and assumptions, and that she was not properly represented by counsel in the juvenile court proceedings below.

## DISCUSSION

"An appealed-from judgment or order is presumed correct. [Citation.] Hence, the appellant must make a challenge. In so doing, he must raise claims of reversible error or other defect [citation], and 'present argument and authority on each point made' [citations]. If he does not, he may, in the court's discretion, be deemed to have abandoned his appeal. [Citation.] In that event, it may order dismissal. [Citation.]" (*In re Sade C.* (1996) 13 Cal.4th 952, 994.)

Mother has established no error in the proceedings below, nor any legal basis for reversal. Substantial evidence supports the juvenile court's conclusion that M. was adoptable, and that adoption was in the child's best interest.

We accordingly dismiss the appeal.

9